[Civ. No. 12951. First Dist., Div. Two. Apr. 29, 1946.]

BEVERLY JONES, a Minor, etc., Respondent, v. CLINTON GREEN, Appellant.

Edward D. Mabson for Appellant.

Milton Marks and Morris Lowenthal for Respondent.

GOODELL, J.—Terissa Jones, the mother and guardian *ad litem* of Beverly Jones, an infant, brought this action under section 196a Civil Code against the appellant, claiming that he is Beverly's father and should therefore be compelled to support the child.

Terissa was married to one Sam Jones in Tennessee but she has not seen him for many years. Plaintiff alleged, and it is an undisputed fact, that she and appellant never have been married.

At the trial appellant was not represented by counsel. His

present attorney came in after judgment and made a motion for a new trial.

The appellant's principal contention is that the court abused its discretion in proceeding with the trial when he had no lawyer. Because of this contention the history of the litigation and the lengthy proceedings prior to trial are of importance.

An order was issued requiring the defendant to show cause why he should not support the child pending the litigation. The defendant promptly filed his answer denying paternity, and the matter of temporary support came on for hearing before Judge Harris on June 16, 1944. The answer had been drawn by an experienced lawyer, who represented appellant at all the hearings for temporary support and continued as his counsel until the morning of trial. There were about six hearings, culminating in an order pendente lite, made by Judge Harris on July 17, 1944, directing appellant to pay $10 a week. The plaintiff later caused a garnishment to be levied on appellant's employer, but it yielded nothing. There has been no compliance whatever with the order.

Counsel for respondent claim there was an understanding that on the order to show cause the entire matter would be gone into so that a trial (in all but a technical sense) could be obviated. Appellant's former counsel did not admit this, but the fact remains that the case was extensively presented by both sides at the hearings. That they amounted to "practically a trial of the case" was stated at the trial by appellant's former counsel. At the hearings a number of witnesses were examined on the question of paternity, about eight on plaintiff's side, and two or three on defendant's. The transcript of the first day's hearing shows that the mother (who came into court with Beverly in her arms) testified that she met appellant on Easter Sunday, in April of 1942; that he came to live with her at her home on Broad Place, in San Francisco, where they slept together and where they continued to live until she moved to Willow street in June of 1942; that he moved her belongings from the old to the new location, and lived there with her until the baby was born, which was on January 31, 1943. The transcript shows that she testified that when she was pregnant appellant made no claim that the child was not his, and that after she returned from the hospital "he said that he knew he did not do right . . . he was coming home and do right"; "he said he was going to do all he could for me and the baby." She also testified as shown by the

transcript that when she returned from the hospital appellant had departed and that ''Every time I asked him for money, he claimed he did not have it.'' After he absented himself, when she saw him on the street he would ''turn and go some other way.'' When Beverly was about six months old the appellant told Terissa ''the kid wasn't his'n'' and repeated it, and when she asked him why not, the only reason he gave was that ''The kid did not have hair like him.'' Terissa's cross-examination was confined to but three subjects, none of which materially weakened her direct testimony as to her relations with appellant: (1) that when she had alleged in the complaint that ''ever since the month of February, 1941'' until the child's birth she and appellant lived together, she had been mistaken as to the date, for when she arrived in San Francisco she had been pregnant for about eight months with another baby born in February, 1942, who lived but a few days; (2) that the father of this deceased baby was in Tennessee and was neither Jones nor appellant; and (3) that she had been confined to the Sonoma State Home for a while.

In January, 1945, the case was set, and thrice reset, for trial. On January 9 appellant's former lawyer sent him, registered, a lengthy letter stating that the plaintiff and her attorney were insisting on a trial and that it had been set for the 10th, but he had obtained a postponement to the 17th. He reminded him that he had told him at several conferences that Judge Harris' decision on the order to show cause ''was a strong indication of what would be the ultimate outcome of the trial of the case upon the same evidence.'' In the letter he continued: ''In other words, the case was practically tried once before Judge Harris'' and ''I told you then, and I now repeat, that unless there is available to you evidence which was beyond our reach or not known to us at the time . . . it is practically a foregone conclusion that another judge trying the same issues upon the same evidence would inevitably find as did Judge Harris. I say again to you that I feel that it would be a waste of time and money on your part to contest this matter further, unless, of course, you are possessed with additional strong evidence to establish that some other person is the father of the child.'' He concluded by saying he would be reluctant to accept a fee to defend the case further because of his doubt that he ''could be of material assistance,'' and asked for an immediate answer. On the 22nd the attorney wrote appellant another registered letter, as lengthy as the

first, stating that the case had been on that morning's calendar for trial and that the presiding judge in again continuing it—to the 29th—had stated that the trial "would have to proceed at that time . . . or a default judgment [would be] entered against you." He then advised him as to the consequences of a default judgment, including possible criminal proceedings. He stated "that without more evidence . . . I see no chance of your prevailing" and that he did "not feel that even if you had the money you should spend it for counsel fees for what seems to be a lost cause." He concluded by saying he wished to withdraw as attorney, and enclosed a form of consent which he asked appellant to sign.

On January 29, 1945, the case was assigned to Judge Schonfeld for trial. Appellant was there, as was the attorney who had represented him from the outset. Plaintiff's attorney was present but the guardian *ad litem*—the baby's mother—was not. Appellant's attorney expressed his desire to withdraw from the case and explained the steps he had taken to obtain appellant's consent in writing. The letters of January 9 and 22, both of which appellant received, went into evidence. Appellant's former counsel stated that the matter had been thoroughly heard before Judge Harris, before whom "There was practically a six-day trial on it," and that any judge trying the case would, in his judgment, reach the conclusion already reached, that appellant was the father; that he could not accept any further fee and that appellant's case was "a lost cause in the face of the evidence already presented. . . . I thought it foolhardy to proceed further. . . ." He stated that at the hearing appellant had admitted having had intercourse with Terissa on two occasions within ten months prior to the baby's birth. He also stated that appellant when the case was first in court had told him that he had certain witnesses to prove that Terissa had been consorting with soldiers and sailors, but that he had been unable to give the names of any. This the appellant admitted.

The judge, the record shows, took ample time and displayed patience and consideration. The matter occupied all morning and a good part of the afternoon. The judge read to appellant excerpts from the letters of January 9 and 22 to assure himself that appellant understood their contents. He asked appellant if he wanted to get in touch with his lodge brothers (Colored Elks) or other friends, looking to his further representation, but was given negative answers. Appellant said he

intended to do "whatever your Honor sees fit to do, go ahead and do it; I am not going to take care of the child. I am not working." This last he repeated, adding, "You can put me in jail." To this the judge replied, "It is not up to me. . . . It is entirely up to you. . . ." The appellant reiterated, "I am not going to support the child; it ain't mine. .I am going to leave it up to you." With respect to his counsel he said: "Let him withdraw, then. He said he couldn't do me any good. I told him he needn't go any further and waste time if he could not do me any good. . . ." And later: "There is no use to go any further." The discussion moved back and forth without making much headway and the judge finally announced that the attorney could withdraw from the case. The attorney remained in the courtroom, however, until after appellant had testified at the trial.

To appellant's statement, "I thought I was going to have another trial" the judge replied, "You can have another trial today." Appellant responded, "I am here. They told me last week to be here Monday morning." To the judge's question, "Are you ready to go to trial?" appellant answered, "Sure I am ready to go to trial," and when asked if he had an attorney he answered, "I haven't got anything. An attorney can't work for nothing."

At the trial proper the transcript of the first day's hearing on the order to show cause, containing Terissa's testimony already summarized, was introduced in her absence. Appellant was then called under section 2055, Code of Civil Procedure and *admitted that he had had intercourse with Terissa on Easter Sunday 1942.* Terissa's aunt named Gertrude Plousha then testified that appellant had lived with Terissa for almost a year—from April, 1942, to the time of the baby's birth, had slept in the same bed with her, had kept his clothes there and had taken his meals there, which, of course, fully corroborated Terissa's testimony already narrated. The aunt testified, further, that appellant had made admissions to her and to the rest of the family that he was the baby's father.

When appellant was recalled to the stand and questioned respecting his earning capacity he answered, "I can't work. They garnisheed my pay." He said he worked only at odd jobs, waxing automobiles and "free-lancing automobile washing."

The judge made the same award as that made on the order to show cause, i. e., $10 a week, and ordered judgment accordingly.

The appellant does not question the proposition that the court's power to permit the withdrawal of an attorney rests within its sound discretion, but claims that here the court's action in permitting such withdrawal was an abuse of discretion, and, further, that the court *sua sponte* should have granted appellant a reasonable continuance to procure other counsel.

It is well established "that the granting or refusing [of] a continuance on account of the illness or absence of counsel is a matter which rests largely, if not wholly, in the discretion of the trial court, and such discretion will not be reviewed unless it is clearly shown to have been abused." (5 Cal.Jur. 970, 982, 984; *Estate of McCarthy,* 23 Cal.App.2d 395 [73 P.2d 913]; *Corbin* v. *Howard,* 61 Cal.App. 715 [215 P. 920]; 12 Am.Jur. 455, 456.)

We have given a rather detailed summary of the circumstances of the instant case, and it is not necessary to repeat or enlarge on them. It is sufficient to say that instead of showing any arbitrary action on the part of the trial judge, they show that he dealt with the matter with deliberation, patience and consideration. One of the factors in such a case is whether or not there is a meritorious defense (see 5 Cal.Jur. 982, § 12, and *Berentz* v. *Belmont Oil Mining Co.,* 148 Cal. 577, 585 [84 P. 47, 113 Am.St.Rep. 308]). In the instant case there was not only no suggestion of a meritorious defense, but the showing before the court indicated that had a continuance been granted, new counsel obtained, and a full trial had, there would have been simply a repetition of what was "practically a six-day trial" on the order to show cause.

In a case such as this, before a plaintiff can obtain an order for temporary support for the child paternity must be proved, and to do this might well take as much time and effort as would have to be expended on a trial on the merits. As was said in *Andrade* v. *Newhouse,* 54 Cal.App.2d 339, 346 [128 P.2d 927], "It is practically equivalent to the necessity of two complete trials on the paternity issue." The appellant was not abandoned; he had been given timely notice that the presiding judge was insisting on the case going to trial and the trial judge offered him the opportunity of getting in touch with lodge brothers or other friends respecting his

defense, but appellant said he was ready to go to trial, and indicated that he had no money wherewith to employ another attorney. He had told the court emphatically that he did not propose to obey the order already outstanding. We find no abuse of discretion in the trial court's action.

The appellant claims that the provisions of section 286, Code of Civil Procedure, are applicable and mandatory in this case, but it was definitely held in *De Recat Corp.* v. *Dunn,* 197 Cal. 787 [242 P. 936], that notice must be given under that section, not when an attorney "ceases to act as such" in a particular piece of litigation, but when he ceases to practice as an attorney.

*Linn* v. *Superior Court,* 79 Cal.App. 721 [250 P. 880], relied on by appellant holds nothing to the contrary. There the petitioner sought a writ of mandate directing the superior court to permit his withdrawal as attorney in a pending action. In denying it the court said, "We have not, however, been referred to a case, and our research has discovered no case, in which it has been held that it is an abuse of discretion or the arbitrary exercise of discretionary power for the court to permit counsel to withdraw, nor have we been referred to a case in which it has been held that counsel has the unqualified right to withdraw." The court concluded, however, on the facts of that case, that if the motion to withdraw had been granted irreparable injury might have been done to *third* parties. "It is undoubtedly true," the court said, *"that in the great majority of instances the attorney should be permitted to withdraw,* but . . . not . . . if his withdrawal will work injustice upon a third party." (Emphasis ours.)

There is no merit in appellant's contention that the evidence is insufficient to support the judgment. At the trial the 28-page transcript of the first day's hearing on the order to show cause was introduced in evidence. This transcript contains the testimony of the mother earlier summarized. Then the appellant was examined under section 2055 and he made the admissions already referred to. Thereafter the aunt was examined, and gave the corroborative testimony to the effect that Terissa and appellant had lived together from April, 1942, until the birth of the baby on January 31, 1943, and that he had admitted to her and to other relatives of Terissa that he was the father.

The appellant's motion for a new trial on the ground of newly discovered evidence was properly denied. The record shows that evidence that appellant had another room in San Francisco during at least part of the time from April, 1942 to January, 1943 was available at the hearings and apparently was laid before the court during the hearings. In any event the fact that he maintained two establishments would not disprove paternity.

A statement made during the trial, that the guardian *ad litem* had been confined to the Sonoma State Home for a while doubtless gave rise to the remark by the judge that a guardian *ad litem* should be appointed in her place and he indicated that Gertrude Plousha, her aunt, was the proper person to appoint. The judgment, however, does not contain any provision removing Terissa Jones, who had been regularly appointed such guardian *ad litem* (at which time the court found her competent), and, furthermore, it purported to appoint Gertrude Plousha "guardian of the *person and property*" of the minor. The judge had suggested a new *guardian ad litem* only. The attempted appointment of a general guardian was irregular for the additional reason that it did not conform to the requirements of sections 1440 et seq., Probate Code. This irregularity, however, in no way vitiates the judgment, for even in the absence of a guardian *ad litem* a judgment recovered on behalf of a minor is not void (13 Cal.Jur., p. 206, § 53; *Foley* v. *California Horseshoe Co.*, 115 Cal. 184 [47 P. 42, 56 Am.St.Rep. 87]).

The purported appointment of a general guardian was a mere nullity which left the original guardian *ad litem* in office. If she is incapacitated she may be removed and Gertrude Plousha or some other competent person substituted for her. (13 Cal.Jur. 207, § 54; *In re Cahill*, 74 Cal. 52 [15 P. 364].) This lies entirely within the control of the court (*In re Hathaway*, 111 Cal. 270 [43 P. 754]), except that section 196a, Civil Code requires the mother's nomination or consent to such appointment unless she is incompetent.

The court is directed to modify the judgment by striking therefrom the paragraph numbered 5 reading: "That Gertrude Plousha is a relative of plaintiff Beverly Jones and is a competent and responsible person to become the guardian of the person and property of said infant," and likewise the paragraph reading: "It is further ordered, adjudged and

decreed that Gertrude Plousha be and she hereby is appointed guardian of the person and property of said Beverly Jones.''

As so modified the judgment is affirmed, respondent to have her costs on appeal.

Nourse, P. J., and Dooling, J., concurred.